IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED PARCEL SERVICE, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. |
| v. | ) |
| | ) |
| GIANINNA MERCADO, | ) |
| | ) |
| Defendant. | ) |

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Plaintiff United Parcel Service, Inc. ("UPS"), by and through its undersigned attorneys, brings this Complaint for Damages and Injunctive Relief against Defendant Gianinna Mercado ("Mercado") and respectfully shows as follows:

## I. NATURE OF THE ACTION

1. This case arises from a calculated and knowing breach of trust by a highly-compensated senior executive who, after nearly 24 years at UPS and while entrusted with sensitive strategic and operational information and relationships, abruptly resigned and joined a direct competitor in violation of her contractual obligations.

2. Mercado served as Vice President of Operations for Latin America and Vice President of Healthcare Sales, placing her among the top 0.5% of UPS employees globally. As a "Band 50" executive, she participated in UPS's Long-

Term Incentive Performance Program ("LTIP Program"), receiving substantial equity awards. In return, she agreed to strict confidentiality and a reasonable one-year non-compete.

3. Despite repeated requests from UPS during and after her departure to disclose her post-employment plans, Mercado refused to answer. UPS later discovered that she had accepted a senior role at World Courier, Inc., a direct competitor of UPS, and had also transferred confidential UPS materials to her personal email, including leveraging her inside UPS knowledge for the express purpose of negotiating compensation from World Carrier in the $775,000 - $850,000 range, above the $700,000 apparently offered.

4. Through this action, UPS seeks to uphold its contractual rights and protect its confidential business interests. While UPS values the contributions of its former employees, it must also ensure that the commitments made under its incentive programs are honored. This lawsuit aims to prevent further harm from Mercado's ongoing violations and to address the consequences of her actions in a fair and appropriate manner.

## II. PARTIES, JURISDICTION, AND VENUE

5. Plaintiff UPS is a Delaware corporation with its principal place of business in Georgia. UPS is therefore deemed a citizen of Delaware and Georgia.

6. Defendant Mercado is an individual who is a citizen of the State of

Florida.

7. The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1) because the parties are diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs. Mercado's misconduct has caused UPS damages in an amount exceeding $75,000. Independently, the value of the injunctive relief sought to enforce Mercado's restrictive covenants exceeds $75,000.

8. The Court has personal jurisdiction over Mercado because she consented to jurisdiction in Georgia in the 2024 UPS Long-Term Incentive Performance Program Amended and Restated Terms and Conditions ("LTIP Terms"), an accurate copy of which is attached as Exhibit A. *See* Ex. A, LTIP Terms § 8.9.1.

9. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district. Venue is also proper in this district because Mercado agreed to the state and federal courts in Fulton County, Georgia as the exclusive jurisdiction and venue for all claims arising out of Section 8 of the LTIP Terms. *See* Ex. A, LTIP Terms § 8.9.1.

## III. GENERAL FACTUAL ALLEGATIONS

### *UPS's Business*

10. UPS is the world's leading package delivery company. It offers transportation, distribution, contract logistics, and other services across North

America, Europe, the Indian sub-continent, the Middle East, Africa, Asia Pacific, and Latin America.

11. Each day, UPS delivers millions of packages to millions of customers in over 220 countries and territories.

12. UPS dedicates substantial time and resources to refining and improving its business operations. Its business is defined by a globally-integrated pickup and delivery network and a diverse portfolio of services, ranging from individual package delivery to complex, large-scale logistics solutions.

13. UPS's logistics network supports air, ground, domestic, international, commercial, and residential delivery services.

14. In addition to its core delivery operations, UPS offers specialized supply chain services for businesses, including freight forwarding, truckload brokerage, customs brokerage, order fulfillment, and returns management.

15. UPS also provides tailored healthcare logistics and supply chain management solutions to meet the needs of healthcare and life sciences organizations around the world.

16. Its subsidiary, Marken UPS Healthcare Precision Logistics ("Marken"), delivers global healthcare logistics services, including the transportation of pharmaceuticals and other critical healthcare products.

### *UPS's Long-Term Incentive Performance Program*

17. UPS offers its highest-level employees, like Mercado, the opportunity to participate in the LTIP Program.

18. The LTIP Program is designed to attract and retain top talent by incentivizing executives—those with access to sensitive business information and key customer relationships—to remain with UPS rather than take their expertise to a competitor.

19. Participation in the LTIP Program is limited to UPS's Senior and Executive Staff (designated as "Band 50" and above), representing an exclusive group that comprises less than 1% of UPS's global workforce.

20. Under the LTIP Program, eligible employees may receive awards of Restricted Stock Performance Units ("Units"), each of which is equivalent in value to one share of UPS Class A common stock.

### *Mercado Affirmatively Accepts Equity Compensation in Exchange for Abiding by Covenants Contained in the LTIP Terms*

21. While obtaining an invitation to the LTIP is exclusive and lucrative, participation is entirely voluntary.

22. LTIP awards are in addition to base pay and other substantial bonuses and benefits.

23. Mercado began at UPS in 2001 as Director of Sales and rose to Vice President of Healthcare Sales in 2021 and ultimately to Vice President of Operations,

Latin America in 2025.

24. When Mercado first became eligible in 2021 for the LTIP Program in her role of Vice President of Healthcare Sales, she was under no obligation to participate in the LTIP Program.

25. However, when Mercado did so, she knowingly and affirmatively agreed to be bound by the operative LTIP Terms in exchange for financial compensation. These awards were not nominal; they represented a substantial amount of potential compensation and were designed to reward and retain UPS's most senior and trusted executives.

26. Each time a participant is granted an award of Units under the LTIP Program, the participant must, through an online process, expressly agree to the operative LTIP Terms in effect when the award was made.

27. Among these, the LTIP Terms contain restrictive covenants, including non-disclosure, non-compete, customer non-solicit, and employee non-solicit provisions. *See* Ex. A, LTIP Terms.

28. While employed, Mercado also executed a separate Employee Proprietary Information and Innovation Agreement ("EPIIA"), an accurate copy of which is attached as Exhibit B.

29. On May 25, 2021, Mercado accepted an award of 524 Units after following the online process for opting-in to the LTIP and agreeing to the applicable

2021 LTIP Terms.

30. On April 6, 2022, Mercado accepted an award of 409 Units after following the online process for opting-in to the LTIP and agreeing to the applicable 2022 LTIP Terms.

31. On April 14, 2023, Mercado accepted an award of 532 Units after following the online process for opting-in to the LTIP and agreeing to the applicable 2023 LTIP Terms.

32. On March 28, 2024, Mercado accepted an award of 657 Units after following the online process for opting-in to the LTIP and agreeing to the applicable 2024 LTIP Terms.

33. Each award certificate states to the effect that by "accepting this Award, you unconditionally agree to be bound by the applicable terms, conditions and provisions of the Plan, the LTIP and this Grant Notice."

34. By accepting the LTIP Terms, Mercado received equity awards with potentially substantial value—awards that were expressly conditioned on her agreement to comply with key restrictions, including non-compete and confidentiality obligations, which she now disregards.

35. On February 8, 2024, 524 Units previously awarded to Mercado under the LTIP Program vested, equivalent to a fair market value of over $88,000.

36. On February 6, 2025, another 409 Units previously awarded to

Mercado under the LTIP Program vested, equivalent to a fair market value of over $24,000.

37. The remaining 1,189 Units granted to Mercado have an estimated fair market value of over $119,000.

***Mercado Leaves UPS to Join World Courier in Breach of Her Covenants***

38. On May 16, 2025, Mercado submitted her resignation from UPS. Her employment officially concluded on May 31, 2025.

39. In the days leading up to her departure, UPS asked Mercado on multiple occasions to disclose her post-employment plans, including the identity of any future employer.

40. Despite these reasonable inquiries, Mercado declined to provide any information regarding her next role—an unusual and concerning departure from standard practice for a senior executive, particularly one bound by restrictive covenants.

41. The LTIP Terms require Mercado to inform any prospective employer of her contractual restrictions. Had her new role posed no conflict, there would have been no apparent reason to withhold this information.

42. Alternatively, if Mercado did disclose her covenants and World Courier hired her anyway, then both she and her new employer may have knowingly disregarded her contractual obligations.

43. In either case, by withholding this information, Mercado deprived UPS of the opportunity to assess and mitigate the risk of competitive harm before it materialized.

***UPS Discovers that Mercado Misappropriated Information from UPS***

44. Shortly after she left, UPS became aware of Mercado's intentions to work for World Courier, a direct competitor of UPS and its subsidiary, Marken.

45. This discovery prompted UPS to conduct a preliminary forensic investigation, which revealed that between March 13, 2025, and May 12, 2025, Mercado used her UPS email account to send multiple emails to her personal Gmail account.

46. These emails contained UPS's confidential information. For instance, in one, Mercado shared sensitive customer and financial information with a recruiter, apparently to help the recruiter to negotiate a higher compensation package from World Courier—seeking a range of $775,000 to $850,000, compared to an initial offer of $700,000—by leveraging her specialized knowledge and experience gained at UPS.

47. UPS's investigation further revealed that Mercado accessed cloud storage accounts on Dropbox and Box from her UPS laptop.

48. These actions constitute breaches of the non-compete and non-disclosure provisions in the LTIP Terms and the EPIIA, and reflect Mercado's intent

to use UPS's confidential information for the benefit of World Courier.

***Mercado Refuses to Comply with the LTIP Terms and EPIIA***

49. On June 23, 2025, UPS sent Mercado a formal letter reiterating its request that she disclose her new employment and inquiring whether she disclosed the existence and terms of her restrictive covenants to her new employer, as required under Section 8.11 of the LTIP Terms. A true and correct copy of this letter (the "Mercado Letter") is attached as Exhibit C.

50. The Mercado Letter also requested that Mercado cease and desist from employment with World Courier and from misappropriating UPS's confidential and trade secret information.

51. Additionally, the Mercado Letter requested that Mercado identify all UPS files or information in her possession and provide UPS with access to any devices or accounts containing such information so that UPS could conduct a forensic analysis.

52. UPS further reminded Mercado of her obligation to preserve all relevant evidence and demanded confirmation of her compliance with the restrictive covenants and evidence preservation requirements.

53. On June 24, 2025, Mercado acknowledged receipt of the Mercado Letter, but she has failed to confirm her compliance with her contractual obligations or UPS's demands or otherwise substantively respond.

***Mercado Assumes a Similar Role at a Direct Competitor***

54. On June 25, 2025, UPS, through its counsel, sent World Courier a letter demanding that World Courier cease and desist from employing Mercado and from misappropriating UPS's confidential and trade secret information. An accurate copy of this letter (the "World Courier Letter") is attached as Exhibit D.

55. UPS also reminded World Courier of its obligation to preserve relevant evidence and requested a prompt response.

56. To date, World Courier has not responded to the World Courier Letter.

57. Upon information and belief, World Courier hired Mercado for the specific purpose of competing with UPS and its subsidiaries, including Marken.

58. UPS, Marken, and World Courier all operate in the global healthcare logistics sector, including the delivery of pharmaceuticals and other healthcare products.

59. At the time of hiring, World Courier knew that Mercado had previously worked at UPS and was subject to restrictive covenants prohibiting her from competing with UPS or disclosing its confidential information.

60. World Courier qualifies as a "Restricted Competitor" under the LTIP Terms because it engages in business activities that directly compete with UPS's global supply chain and package delivery services.

61. Mercado's role at World Courier's operations would involve her

providing services that (a) are similar to or relate to those services that she provided to UPS during her employment as both Vice President of Healthcare Sales and Vice President of Operations, Latin America and (b) relate to World Courier's competition with the transportation, delivery, or logistics services provided by UPS and Marken during her employment with UPS.

62. Mercado is, or imminently will be, performing many of the same functions for World Courier that she previously performed for UPS. Her deep knowledge of UPS's operations and customer relationships will provide World Courier with a significant competitive advantage and allow it to better compete with UPS and Marken by delivering products to market in a timelier, more cost-effective, and safer manner as well as by identifying potential customers.

63. Mercado is thus in breach of the non-compete in Section 8.6 of the LTIP Terms.

***Mercado's Employment as a UPS Executive and Access to Sensitive Information***

64. During her nearly 24-year career at UPS, the company invested significant time, training, and resources to develop Mercado's expertise in global logistics and customer relationship management.

65. Through her work at UPS, Mercado acquired specialized skills, learning, or abilities; customer contacts; and customer information.

66. As Vice President of Healthcare Sales, Mercado was based in Miami,

Florida, and led UPS's healthcare logistics and sales strategy, focusing on expanding its presence in the healthcare and life sciences sectors, including pharmaceuticals, medical devices, diagnostics, and biopharma industries.

67. In that role, she led a 40-person team overseeing billions in sales, including helping negotiate a nine-figure contract. She gained deep knowledge of healthcare industry regulations and UPS's advanced logistics solutions, including temperature-controlled transportation and supply chain visibility.

68. In 2025, Mercado became UPS's Vice President of Operations, Latin America, which involves operations in 50 countries in Latin America from her home base in Miami, Florida.

69. The scope of Mercado's authority and operations rivaled most CEOs—as Vice President of Operations, Latin America, she oversaw a $1 billion operation with over 1,800 employees.

70. Unlike her predecessor, when Mercado became Vice President of Operations, Latin America, she was given management and operations authority over both UPS's delivery *and* logistics business units for Latin America. This included managing supply chain services, one of UPS's biggest air cargo operations, package delivery, and all aspects of logistics, with a focus on healthcare logistics.

71. Mercado's day-to-day consisted of overseeing and optimizing the company's operational performance, including finances, safety, revenue, personnel,

customers, and business units.

72. Both as Vice President of Healthcare Sales and as Vice President of Operations, Latin America, Mercado was intimately involved in the strategic planning and execution of UPS's global operations and units of UPS's business.

73. In both roles, she was regularly entrusted with UPS's trade secrets, confidential business information, and business relationships.

74. In both roles, Mercado customarily and regularly solicited, managed, and interacted with current and prospective UPS customers.

75. In both roles, Mercado was responsible for securing contracts and sales for services to be performed by UPS.

76. In both roles, Mercado had a primary duty of managing departments or subdivisions of UPS.

77. In both roles, Mercado customarily and regularly directed the work of two or more other employees, and she had upwards of hundreds or more employees in her hierarchy.

78. In both roles, Mercado had the authority to hire or fire other employees or had particular weight given to suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees, and to set or weigh in on policies and practices in effect.

79. By reason of UPS's investment of time, training, money, trust, exposure

to the public, or exposure to customers, vendors, or other business relationships during the course of Mercado's employment, Mercado gained a high level of influence or credibility with UPS's customers, vendors, or other business relationships.

***The LTIP Terms' Restrictive Covenants***

80. In the LTIP Terms, Section 8.6 is entitled "Covenant Not to Compete" and provides:

> During the Non-Compete Restricted Period you will not, without the prior written consent of the Company (a) work for a Restricted Competitor; (b) provide consulting services to a Restricted Competitor; or (c) otherwise provide services to a Restricted Competitor, in each of (a) through (c) that involves the provision of services that are similar to or relate to those services that you provided to the Company at any time during your employment and that relate, in any way, directly or indirectly, to the Restricted Competitor's competition with the transportation, delivery or logistics services provided by the Company during your employment. This non-compete provision is limited to the geographic area where the Company did business during your employment.

81. In the LTIP Terms, the "Company" is defined as "United Parcel Service, Inc., a Delaware Corporation with its principal place of business in Atlanta, Georgia, and all of its Affiliates (as defined in O.C.G.A. § 13-8-51(1))." Ex. A, LTIP Terms § 8.12.1.

82. In the LTIP Terms, the "Non-Compete Restricted Period" is defined as "during your employment with the Company and for a period of one (1) year after your employment ends for any reason." *Id.* § 8.12.4.

83. In the LTIP Terms, "Restricted Competitors" is defined as:

> a person engaged in any business competitive with the Company's and its Subsidiaries' businesses of package delivery and global supply chain management solutions. Restricted Competitors shall be defined to include any affiliates of such entities that are engaged in delivery, transportation, and/or logistics services and activities. In addition, Restricted Competitors include, without limitation, the entities listed on Exhibit B.

*Id.* § 8.12.8.

84. In the LTIP Terms, Section 8.3 is entitled "Non-Disclosure and Prohibition Against Use of Confidential Information" and provides that the participant "will not directly or indirectly, reveal, divulge, or disclose any Confidential Information or Trade Secrets to any person not expressly authorized by the Company to receive such information" and "will not, directly or indirectly, use or make use of any Confidential Information or Trade Secrets in connection with any business activity other than business activity that you are pursuing on behalf of the Company."

85. In the LTIP Terms, Section 8.3 provides: "The act of emailing Confidential Information or Trade Secrets or both to your personal email address is considered to be a breach of this section."

86. Section 8.3 of the LTIP Terms also states:

> You promise that, no later than the end of your Company employment, you will return to the Company all files, memoranda, documents, records, credit cards, keys, computers, printers, telephones, and other property of the Company or its affiliates in your possession, custody,

> or control, including without limitation all Confidential Information. To the extent that you have, or become aware after your Separation Date that you have, electronic files or information in your personal possession or under your control that belong to the Company or contain Confidential Information (specifically including without limitation electronic files or information stored on personal computers, mobile devices, electronic media, or in cloud storage), you promise that you will notify the Company in writing as to such possession or control prior to your Separation Date or immediately after you become aware of such possession, and, if requested to do so by the Company you will cooperate with the Company, and take direction from the Company, regarding the deletion or return of all such files and information . . . . To the extent requested by the Company, whether prior to or after the Separation Date, you will voluntarily participate in a process involving a forensic computer specialist chosen by the Company to identify, quarantine, preserve and delete all electronic files or information, including all copies and derivatives thereof, in your possession or under your control that belong to the Company or contain Confidential Information.

87. In the LTIP Terms, "Confidential Information" is defined as:

> all information regarding the Company, its activities, businesses or customers which you learned as a result of your employment, that is valuable to the Company and that is not generally disclosed by practice or authority to persons not employed or otherwise engaged by the Company, whether or not it constitutes a Trade Secret.

*Id.* § 8.12.2. The definition also includes a non-exhaustive list of examples of Confidential Information.

88. In the LTIP Terms, "Trade Secret" is defined as:

> all of the Company's information that you learned about as a result of your employment, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, distribution lists or a list of actual or potential customers, advertisers or suppliers, that (i) derives

> economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* § 8.12.9.

89. In the LTIP Terms, Section 8.7 provides:

> In the event that you breach, or threaten to breach, the Protective Covenants, you agree that the Company shall have the right and remedy to: (a) enjoin you, preliminarily and permanently (without the necessity of posting bond), from violating or threatening to violate the Protective Covenants because any breach or threatened breach of the Protective Covenants would cause irreparable injury to the Company and that money damages would not provide an adequate remedy; (b) require you to account for and pay over to the Company all compensation, profits, monies, or other benefits derived or received by you as the result of any breach of the Protective Covenants; and (c) require you to pay the reasonable attorneys' fees and costs incurred by the Company in enforcing the Protective Covenants. In addition, in the event of such a violation, you will automatically forfeit all Units.

90. The restrictive covenants in the LTIP Terms are justified by UPS's legitimate business interests, including protecting its trade secrets and other valuable confidential information, protecting its substantial relationships with prospective and existing customers, and protecting its customer goodwill.

***The Employee Proprietary Information and Innovation Agreement***

91. In Paragraph (A) of the EPIIA, Mercado "agree[d] not to use, publish; or otherwise disclose (except as my job duties may require), either during or subsequent to my employment, any secret* or confidential* information or data of the Company or any information or data of others that the Company is obligated to

maintain in confidence."

92. In Paragraph (A) of the EPIIA, Mercado further agreed that she "will at the Company's request, or upon termination of my employment for any reason deliver to the Company promptly all items in any media that belong to or contain confidential* or secret* information belonging to the Company or that by their nature are for the use of Company employees only, and to destroy or return all copies of such items; and to delete such items from any computers other than Company computers."

93. The EPIIA states that UPS considers "secret" or "confidential" "any information or data useful to the Company that is not generally known regardless of whether such information or data is in oral, written, electronic, machine readable or other form." Ex. B, EPIIA at 2.

94. To the extent that UPS's confidential information does not constitute a trade secret, Mercado agreed "not to use or disclose that confidential information during [her] employment, except as [her] Company duties may requires, and for a period of two years thereafter." *Id.*

***Mercado's Breach of Her Restrictive Covenants Irreparably Harms UPS***

95. UPS entered into the restrictive covenants in the LTIP Terms with Mercado to protect its legitimate business interests in its trade secrets and other valuable confidential information, its substantial relationships with prospective and

existing customers, and its customer goodwill.

96. UPS has a substantial interest in protecting and safeguarding Mercado's knowledge of various confidential information regarding UPS's business and customers that Mercado was privy to and, in some cases, instrumental in creating and developing.

97. UPS also has a substantial interest in protecting the existing and prospective customer relationships and goodwill that Mercado developed and maintained during her employment with UPS.

98. Mercado's breach of her non-compete and non-disclosure obligations has irreparably harmed UPS and UPS will continue to be irreparably harmed if its confidential information, prospective and existing customer relationships, and customer goodwill are not protected.

99. UPS lacks an adequate remedy at law for Mercado's breach of her non-compete and non-disclosure obligations to UPS.

100. Mercado agreed that any breach or threatened breach of her non-compete or non-disclosure covenants would cause UPS "irreparable injury" for which "money damages would not provide an adequate remedy." Ex. A, LTIP Terms § 8.7.

101. On the other hand, Mercado will not suffer any undue burden from the enforcement of the agreement. Compliance with the LTIP Terms and the EPIIA does

not preclude Mercado from working altogether.

102. Indeed, Mercado agreed in the LTIP Terms that she would be able to obtain suitable employment that would not breach her non-compete restriction. *Id.* § 8.2.

103. Mercado also agreed that UPS "shall have the right and remedy to . . . enjoin [her], preliminarily and permanently (without the necessity of posting bond), from violating or threatening to violate" her restrictive covenants and that it would be difficult or impossible to quantify the harm to UPS caused by Mercado. *Id.* § 8.7.

104. Accordingly, the only sufficient protection is an injunction against Mercado's continuing and future breaches that requires Mercado to comply with her non-compete and non-disclosure obligations in the LTIP Terms as well has her non-disclosure obligations in the EPIIA.

***Enforcing Mercado's Covenants Serves the Public Interest***

105. Enforcing the restrictive covenants to which Mercado agreed would serve the public interest as expressed by the Georgia Assembly, which has affirmed the value of such covenants in "protecting legitimate business interests and creating an environment that is favorable to attracting commercial enterprises to Georgia and keeping existing businesses within the state." O.C.G.A. § 13-8-50.

106. Georgia's public interest is served by enforcing a valid agreement entered into by a Georgia-headquartered company, such as UPS.

107. The Georgia public and UPS both have a significant interest in the enforcement of the restrictive covenants in the LTIP Terms and the EPIIA, which are reasonable and comply with the Georgia Restrictive Covenant Act. These interests are not outweighed by any interest that Mercado has in breaching a plainly enforceable agreement to which she agreed.

108. In sum, all equitable factors weigh in favor of issuing preliminary and permanent injunctive relief to enforce Mercado's non-compete and non-disclosure obligations.

109. Mercado has acted in bad faith, has been stubbornly litigious, and has caused UPS unnecessary trouble and expense.

110. Pursuant to Section 8.7 of the LTIP Terms, Mercado is also contractually obligated to pay UPS's reasonable attorneys' fees and costs incurred in enforcing her obligations.

111. All conditions precedent to the filing of this action have been performed, waived, or otherwise satisfied.

## COUNT I
## Breach of Contract – 2024 LTIP Terms Non-Compete Provision

112. UPS incorporates the allegations in paragraphs 1 through 111 as if set forth here.

113. The LTIP Terms is a valid, binding, and enforceable agreement between UPS and Mercado.

114. UPS performed all conditions, duties, obligations and promises required to be performed by UPS under the LTIP Terms.

115. The LTIP Terms contain an enforceable non-compete that is reasonably limited in time, geographic area, and scope of prohibited activities.

116. Mercado is in breach of the LTIP Terms through her employment with World Courier.

117. UPS has legitimate business interests in entering into and enforcing the non-compete restriction with Mercado, as articulated above.

118. Mercado's breach of the non-compete in the LTIP Terms has damaged, and will continue to damage, UPS in an amount to be proven at trial.

119. Mercado's breach of the non-compete in the LTIP Terms have caused, and absent an injunction will continue to cause, irreparable harm to UPS.

120. Additionally, UPS is entitled to an award of the reasonable attorneys' fees and costs it incurs in enforcing the non-compete in the LTIP Terms. *See* Ex. A, LTIP Terms § 8.7.

WHEREFORE, Plaintiff UPS respectfully requests that the Court enter a judgement in its favor and against Defendant Mercado awarding:

A. Injunctive relief enjoining Mercado's further employment at World Courier in violation of her non-compete;

B. Damages in an amount to be determined at trial;

C. UPS's reasonable attorneys' fees, costs, and other expenses of litigation pursuant to the LTIP Terms, O.C.G.A. § 13-6-11, or any other applicable law or contract;

D. Post-judgment interest; and

E. Such other and further relief as the Court deems just and proper.

## COUNT II
## Breach of Contract - 2024 LTIP Terms Non-Disclosure Provision

121. UPS incorporates the allegations in paragraphs 1 through 111 as if set forth here.

122. The LTIP Terms is a valid, binding, and enforceable agreement between UPS and Mercado.

123. UPS performed all conditions, duties, obligations and promises required to be performed by UPS under the LTIP Terms.

124. Mercado breached the non-disclosure covenant in the LTIP Terms by sending UPS's confidential and trade secret information from her UPS email account to her personal email account and by, upon information and belief, transferring UPS's confidential and trade secret information to her personal cloud storage accounts, and by using UPS's confidential information for World Courier's benefit.

125. Mercado further breached the non-disclosure covenant in the LTIP Terms by failing to notify UPS in writing as to her possession or control of UPS confidential or trade secret information, failing to cooperate with UPS regarding the

deletion or return of all such files and information, and failing to comply with UPS's request that she participate in a process involving a forensic computer specialist chosen by UPS to identify, quarantine, preserve and delete all electronic files or information, including all copies and derivatives thereof, in her possession or under her control that belong to UPS or contain its confidential information.

126. UPS has legitimate business interests in entering into and enforcing the non-disclosure restriction with Mercado, as articulated above.

127. Mercado's breaches of the non-disclosure provision in the LTIP Terms have damaged, and will continue to damage, UPS in an amount to be proven at trial.

128. Mercado's breaches of the non-disclosure provision in the LTIP have caused, and absent an injunction will continue to cause, irreparable harm to UPS.

129. Additionally, UPS is entitled to an award of the reasonable attorneys' fees and costs it incurs in enforcing the non-disclosure provision in the 2025 LTIP Terms. *See* Ex. A, LTIP Terms § 8.7.

WHEREFORE, Plaintiff UPS respectfully requests that the Court enter a judgement in its favor and against Defendant Mercado awarding:

A. Injunctive relief enjoining Mercado from accessing, disclosing, or otherwise using any of UPS's confidential or trade secret information; requiring Mercado to return to UPS all of its confidential or trade secret information in her possession, custody, or control; and requiring Mercado to submit her computers,

mobile devices, electronic media, email accounts, cloud storage accounts, and other media, devices, and equipment to a forensic computer specialist chosen by UPS to identify, quarantine, preserve, and delete all electronic files or information, including all copies and derivatives thereof, in Mercado's possession or under her control that belong to the UPS or contain Confidential Information, as defined in the LTIP Terms;

B. Damages in an amount to be determined at trial;

C. UPS's reasonable attorneys' fees, costs, and other expenses of litigation pursuant to the LTIP Agreement, O.C.G.A. § 13-6-11, or any other applicable law or contract;

D. Post-judgment interest; and

E. Such other and further relief as the Court deems just and proper.

**COUNT III**
**Breach of Contract - EPIIA**

130. UPS incorporates the allegations in paragraphs 1 through 111 as if set forth here.

131. The EPIIA is a valid and enforceable contract between UPS and Mercado.

132. Mercado breached the EPIIA by sending UPS's confidential and trade secret information from her UPS email account to her personal email account and by, upon information and belief, transferring UPS's confidential and trade secret

information to her personal cloud storage accounts, and by using UPS's confidential information for World Courier's benefit.

133. Mercado's breaches of the EPIIA have damaged, and will continue to damage, UPS in an amount to be proven at trial.

134. Mercado's breaches of the EPIIA have caused, and absent an injunction will continue to cause, irreparable harm to UPS.

WHEREFORE, Plaintiff UPS respectfully requests that the Court enter a judgement in its favor and against Defendant Mercado awarding:

A. Injunctive relief enjoining Mercado from accessing, disclosing, or otherwise using any of UPS's confidential or trade secret information and requiring Mercado to return to UPS all of its confidential or trade secret information in her possession, custody, or control;

B. Damages in an amount to be determined at trial;

C. UPS's reasonable attorneys' fees, costs, and other expenses of litigation pursuant to O.C.G.A. § 13-6-11, or any other applicable law or contract;

D. Post-judgment interest; and

E. Such other and further relief as the Court deems just and proper.

Dated: June 26, 2025

Respectfully submitted,

BERMAN FINK VAN HORN P.C.

By: */s/ Daniel H. Park*
Daniel H. Park
Georgia Bar No. 930188
Jeremy L. Kahn
Georgia Bar No. 796717
Emma L. Sammons
Georgia Bar No. 518517
3475 Piedmont Road, N.E., Suite 1640
Atlanta, Georgia 30305
(404) 261-7711
dpark@bfvlaw.com
jkahn@bfvlaw.com
esammons@bfvlaw.com

*Counsel for Plaintiff*
*United Parcel Service, Inc.*