# EXHIBIT D

BFV
BERMAN FINK VAN HORN
ATTORNEYS AT LAW

DANIEL H. PARK
dpark@bfvlaw.com
Direct: 404-261-0379

June 25, 2025

World Courier, Inc.
c/o Kevin M. Passerini, Esq.
Blank Rome LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
*kevin.passerini@blankrome.com*

**VIA UPS NEXT DAY AIR AND EMAIL**

**Re: Employment of Gianinna Mercado**

Dear Kevin:

As you know, this firm represents United Parcel Service, Inc. and its subsidiaries, including UPS Latin America, Inc. and Marken UPS Healthcare Precision Logistics ("Marken") (collectively, "UPS"). We understand that World Courier has recently hired Gianinna Mercado to work in its Latin American operations. As World Courier is a direct competitor of Marken, Ms. Mercado's employment with World Courier would be in direct violation of her noncompete agreement with UPS. We write to demand that World Courier confirm whether it has hired Ms. Mercado and, if so, that World Courier cease and desist from its employment of Ms. Mercado. We further demand that World Courier immediately notify us if Ms. Mercado has disclosed any of UPS's confidential or trade secret information to World Courier.

***The LTIP Terms and Conditions and Noncompete***

Ms. Mercado is subject to the UPS Long-Term Incentive Performance (LTIP) Program Terms and Conditions. Through accepting various LTIP awards, Ms. Mercado agreed to multiple versions of the LTIP Terms and Conditions. As relevant here (and without waiving UPS's right to rely on additional versions of the LTIP Terms and Conditions that Ms. Mercado also accepted), Ms. Mercado accepted the UPS Long-Term Incentive Performance Program Amended and Restated Terms and Conditions dated March 20, 2024 (the "2024 LTIP Terms") when she accepted her March 20, 2024, LTIP award. A redacted copy of the 2024 LTIP Terms is enclosed.

Specifically, on March 28, 2024, Ms. Mercado completed an online process to expressly accept the 2024 LTIP Terms when she accepted the March 20, 2024, award. A redacted copy of the accepted award certificate is also enclosed. The 2024 award certificate states: "By accepting this Award, you unconditionally agree to be bound by the applicable terms, conditions and provisions of the Plan, the LTIP and this certificate." It further states: "By accepting this Award,

you unconditionally agree to be bound by the applicable employee covenants included in the terms and conditions of the LTIP."

The 2024 LTIP Terms contain restrictive covenants, including noncompete and nondisclosure provisions. Section 8.9.1 provides that Georgia law governs these restrictive covenants and that the state and federal courts in Fulton County, Georgia shall be the exclusive jurisdiction and venue for any disputes related to the restrictive covenants.

Section 8.6 of the 2024 LTIP Terms is a noncompete, which provides:

> During the Non-Compete Restricted Period, you will not, without the prior written consent of the Company, (a) work for a Restricted Competitor; (b) provide consulting services to a Restricted Competitor; or (c) otherwise provide services to a Restricted Competitor, in each of (a) through (c) that involves the provision of services that are similar to or relate to those services that you provided to the Company at any time during your employment and that relate, in any way, directly or indirectly, to the Restricted Competitor's competition with the transportation, delivery or logistics services provided by the Company during your employment. This non-compete provision is limited to the geographic area where the Company did business during your employment.

The "Non-Compete Restricted Period" is defined as "during your employment with the Company and for a period of one (1) year after your employment ends for any reason." 2024 LTIP Terms § 8.12.4. "Restricted Competitors" means "a person engaged in any business competitive with the Company's and its Subsidiaries' businesses of package delivery and global supply chain management solutions. Restricted Competitors shall be defined to include any affiliates of such entities that are engaged in delivery, transportation, and/or logistics services and activities. *In addition*, Restricted Competitors include, *without limitation*, the entities listed on <u>Exhibit B</u>." *Id.* § 8.12.8 (emphasis added)).

Ms. Mercado's employment with World Courier would be a direct violation of the noncompete. World Courier is a "Restricted Competitor" as it is engaged in business activities competitive with UPS's and its subsidiaries' (including Marken) businesses of package delivery and global supply chain management solutions. Both World Courier and Marken engage in global healthcare logistics, including the delivery of pharmaceuticals and other healthcare products. Furthermore, Ms. Mercado's work for World Courier's Latin American operations would involve the provision of services that are similar to or relate to those services that she provided to UPS during her employment.

Accordingly, within 48 hours of this letter, we demand that World Courier confirm that it will cease and desist from such employment of Ms. Mercado.

***Trade Secrets and Other Confidential Information***

Because of her positions at UPS, Ms. Mercado was exposed to UPS's Confidential

Information and Trade Secrets (as those terms are defined in the 2024 LTIP Terms). In Section 8.3 of the 2024 LTIP Terms, she agreed that she "will not, directly or indirectly, reveal, divulge, or disclose any Confidential Information or Trade Secrets to any person not expressly authorized by the Company to receive such information." She further agreed that she "will not directly or indirectly, use or make use of any Confidential Information or Trade Secrets in connection with any business activity other than business activity that you are pursuing on behalf of the Company."

Based on a preliminary investigation, UPS has concerns that Ms. Mercado has misappropriated UPS Confidential Information or Trade Secrets in violation of her non-disclosure covenant as well as the Defend Trade Secrets Act and similar state law. While UPS's investigation of Ms. Mercado's conduct is ongoing, we note that Ms. Mercado engaged in activity on cloud storage accounts from her UPS devices in the period shortly before her resignation from UPS even though she had no legitimate business reason to engage in such activity on a UPS device. This includes activity on Dropbox on May 1, 2025, and on Box on April 7 and 15, 2025. Furthermore, between March 2, 2025 and May 31, 2025, Ms. Mercado sent at least 33 emails from her UPS email address to private Gmail accounts. This included files related to a UPS service contract.

Any improper acquisition or use of UPS's trade secrets by World Courier would subject World Courier to liability under the Defend Trade Secrets Act and similar state law.

Accordingly, we demand that World Courier confirm whether it has obtained any of UPS's trade secret or other confidential information through Ms. Mercado. If so, we demand that World Courier identify all such trade secret and confidential information it obtained.

***World Courier's Obligations to Preserve and Not Destroy Relevant Evidence***

In addition to the above demands, in light of World Courier's conduct and UPS's claims and potential claims against you and Ms. Mercado, World Courier may be in possession of critical evidence regarding this matter, including on its computers and any other electronic devices capable of storing electronic information (such as smartphones, webmail accounts, and other devices or media capable of storing electronic information). It is imperative that all evidence related in any way to this matter be preserved. This includes all emails, text messages, voicemails, social media communications, call logs, or chat messages that relate in any way to World Courier's recruitment or hiring of Ms. Mercado, Ms. Mercado's actual or prospective job duties and the performance of such job duties at World Courier.

Please be advised that simply continuing to use World Courier's computers and electronic storage devices may destroy potential electronic evidence critical to this matter, and that failure to preserve and retain electronic data may constitute spoliation of evidence. Pending discovery concerning World Courier's computer systems and electronic storage devices, or any further agreement as to the preservation and production of electronic evidence, World Courier should take the necessary steps to ensure that all relevant electronic evidence is preserved.

* * *

UPS requests a response to its demands by no later than the close of business on June 27, 2025. Please note that UPS takes this matter extremely seriously. World Courier's failure to comply with UPS's demands will leave UPS no choice but to pursue legal action against World Courier for tortious interference and trade-secret misappropriation and to immediately file an action against it and seek temporary, preliminary, and permanent injunctive relief as well as damages and attorneys' fees.

UPS looks forward to receiving your response to this letter confirming World Courier's compliance with the demands set forth above.

Nothing in this letter should be considered a limitation or restriction on the claims UPS may assert against you. UPS reserves all rights.

You should direct all future communications and correspondence to my attention.

Sincerely,

BERMAN FINK VAN HORN P.C.

*/s/ Daniel H. Park*

Daniel H. Park

cc: United Parcel Service, Inc.
Jeremy L. Kahn, Esq.
Giannina Mercado

Enclosures

# UPS LONG-TERM INCENTIVE PERFORMANCE PROGRAM

Amended and Restated Terms and Conditions

March 20, 2024

1. **Establishment, Objectives and Duration.**

1.1 **Establishment of the Program and Effective Date.** The Compensation and Human Capital Committee of the Board of Directors of United Parcel Service, Inc. ("Committee") hereby amends and restates the terms and conditions of the UPS Long-Term Incentive Performance Program ("LTIP") which provides for Awards in the form of Restricted Performance Units ("Units") pursuant to the United Parcel Service, Inc. 2021 Omnibus Incentive Compensation Plan ("ICP"). Unless otherwise defined in this document, capitalized terms shall have the meanings set forth in the ICP. These LTIP Terms and Conditions shall be effective for any LTIP Awards made on or after the date set forth above ("LTIP Effective Date").

1.2 **Objectives of the LTIP.** The objectives of the LTIP are to align incentive pay with long-term performance related to key business objectives, enhance retention of key talent, and align the interests of shareowners with the incentive compensation opportunity for executives.

1.3 **Duration of the Program.** The LTIP shall commence on the LTIP Effective Date and shall remain in effect, subject to the right of the Committee to amend or terminate the LTIP at any time pursuant to Section 14.6 hereof.

2. **Administration.**

2.1 **Authority of the Committee.** The LTIP shall be administered by the Committee, which shall have the same power and authority to administer the LTIP as it does to administer the ICP.

2.2 **Decisions Binding.** All decisions of the Committee shall be final, conclusive and binding on all persons, including the Company, its shareowners, any employee, and their estates and beneficiaries.

2.3 **Delegation.** The Committee may (subject to applicable law, regulation and the terms of the ICP), delegated its power, authority and duties as identified herein to administer the LTIP, other than the power, authority and duties to grant and approve LTIP Awards to Executive Leadership Team Eligible Employees, to (i) any committee comprised of members of management of the Company responsible for determining or overseeing compensation for individuals other than Executive Leadership Team members or (ii) to the Executive Leadership Team or (iii) any members thereof such responsibility (the "Management Compensation Committee"). Except as set forth above, the Management Compensation Committee shall have the powers, authority and duties of the Committee as contained herein, and references to the "Committee" shall be deemed to refer to the Committee or the Management Compensation Committee, as applicable.

3. **Units Subject to Award.** Your target number of Units subject to an Award is determined by (1) the product of (a) your Target LTIP Award Percentage on Exhibit A multiplied by (b) your annualized monthly salary in effect on the grant date specified in your grant notice (the "Grant Date"), then (2) divided by the Fair Market Value of a Share on the Grant Date, rounded up to the nearest whole number of Units.

4. **Eligibility for Awards.** The Committee shall have broad discretion to determine the eligibility criteria for Awards for members of the Executive Leadership Team, including the Grant Date and any proration applicable to any Award for any reason, including as a result of an individual becoming an employee or changing job classification in a manner that would result in a different LTIP target payout percentage for that individual, after the Grant Date.

5. **Award Document.** You will receive a grant notice that specifies the Grant Date, the target number of Units subject to an Award, which may be prorated for the number of months remaining in the Performance Period (as defined below), and such other provisions as the Committee shall determine. Such grant notice, together with this document, shall constitute the "Award Document" for the applicable Award for purposes of the ICP.

6. **Acceptance.** You must expressly accept the terms and conditions of your Award. To accept, log on to Merrill Lynch Benefits Online at www.benefits.ml.com, select Equity Plan > Grant Information > Pending Acceptance. If you do not accept your Award in the manner instructed by the Company, the Units subject to an Award may be subject to cancellation. If you do not wish to receive your Award, then you understand that you must reject the Award by contacting Shareholder Services (shareholderservices@ups.com) no later than 90 days following the Grant Date specified in the applicable grant notice in which case the Award will be cancelled.

7. **Performance Metrics; Earned Units.** The number of Units earned for an Award will be determined based upon the Company's (a) adjusted earnings per share (growth) and (b) free cash flow performance, each during a three-year performance period identified in the applicable grant notice (the "Performance Period"), subject to modification based on (c) total shareholder return performance during the Performance Period. Performance and payout will be determined independently for each metric. The number of Units earned under an Award will be calculated as follows:

| | | | | | | |
|---|---|---|---|---|---|---|
| (a)<br>Adjusted Earnings Per Share Payout %<br>x<br>50% | + | (b)<br>Free Cash Flow Payout %<br>x<br>50% | +/ - | (c)<br>RTSR Payout Modifier<br>(if applicable) | = | Award Payout % |

The Award Payout % is then multiplied by the target number of Units received under the Award, including any dividend equivalent units (described below), to determine the total number of Units earned for the Award.

7.1 **Adjusted Earnings Per Share (Growth).** Adjusted earnings per share is determined by dividing the Company's adjusted net income available to common shareowners by the diluted weighted average shares outstanding during applicable year(s) of the Performance Period. The adjusted earnings per share growth target is the projected average annual adjusted earnings per share growth during each of the applicable years within the Performance Period. The actual adjusted earnings per share (growth) for each applicable year of the Performance Period will be compared to the target and assigned a payout percentage; the average of the three payout percentages will be used to calculate the final payout percentage under this metric. Following the completion of the Performance Period, the Committee will certify (i) the actual adjusted earnings per share (growth) for the Performance Period; (ii) the actual adjusted earnings per share (growth) for the Performance Period as compared to the targets; and (iii) the final payout percentage for this metric.

7.2 **Free Cash Flow.** Free cash flow is determined by reducing the Company's cash flow from operations by capital expenditures net of proceeds from disposals of fixed assets, and adjusting for net changes in finance receivables and other investing activities. The free cash flow target is the projected aggregate free cash flow generated during the entire three years of the Performance Period. Following the completion of the Performance Period, the Committee will certify (i) the actual free cash flow for the Performance Period; (ii) the actual free cash flow for the Performance Period as compared to the target; and (iii) the final payout percentage for this metric.

7.3 **Total Shareholder Return.** Total shareholder return measures the total return on an investment in the Company's class B common stock (the "Stock") to an investor (stock price appreciation plus dividends). The total return on the Stock shall be compared with the total return on the stocks of

the companies listed on the Standard & Poor's 500 Composite Index ("Index") at the beginning of the Performance Period. The Committee shall then assign the Company a percentile rank relative to the companies listed on the Index (the "S&P 500 Companies") based on total shareholder return performance ("relative total shareholder return" or "RTSR"). Following the completion of the Performance Period, the Committee will certify (i) the Company's actual total shareholder return for the Performance Period; (ii) the total shareholder return of each of the S&P 500 Companies during the Performance Period; (iii) the percentile ranking for the Company as compared to S&P 500 Companies for the Performance Period; and (iv) the final payout modifier, if any, for the Award as described below.

**7.3.1** **Payout Modifier**: The number of Units earned under an Award may be modified up or down, if applicable, based on RTSR as follows:

| **Total Shareholder Return**<br><br>**Percentile Rank Relative to S&P 500 Companies** | **Payout Modifier** |
|---|---|
| Above 75th percentile | +20% |
| Between 25th and 75th percentile | None |
| Below 25th percentile | -20% |

**7.3.2** **TSR Calculation**: TSR is determined as follows:

$$\text{TSR} = \frac{(\text{Ending Average} + \text{Dividends Paid}) - \text{Beginning Average}}{\text{Beginning Average}}$$

Beginning Average: the average closing price of a share of the respective S&P 500 Company's common stock for the 20 trading days prior to the start of the Performance Period on which shares of such company's common stock were traded.

Ending Average: the average closing price of a share of the respective S&P 500 Company's common stock over the last 20 trading days of the Performance Period, accounting for compounding Dividends Paid, on which shares of such company's common stock were traded.

Dividends Paid: the total of all dividends paid on one share of the respective S&P 500 Company's common stock during the Performance Period, provided that the record date occurs during the Performance Period, and provided further that dividends shall be treated as though they are reinvested on the day of payment using the closing price of a share of the respective S&P 500 Company's common stock on that day.

**7.4** **Adjustments.** In determining attainment of performance targets the Committee will have discretion to exclude the effect of unusual or infrequently occurring items, charges for restructurings (including employee severance liabilities, asset impairment costs, and exit costs), discontinued operations, extraordinary items and the cumulative effect of changes in accounting treatment, and may determine to exclude the effect of other items, each determined in accordance with GAAP (to the extent applicable) and as identified in the financial statements, notes to the financial statement or discussion and analysis of management.

**8. Employee Covenants.**

**8.1 Acknowledgements.** You acknowledge and agree that, by reason of your highly specialized skillset and the Company's investment of time, training, money, trust, and exposure to Confidential Information, you are intimately involved in the planning and direction of the Company's global business operations. You further acknowledge and agree that your agreement to enter into, and your compliance with, your covenants in this Section 8 are material factors in the Company's decision to grant you the Units, which constitutes good and valuable consideration for the covenants set forth in this Section 8. You further acknowledge and agree that your breach or threatened breach of any of the covenants in this Section 8 would result in material and irreparable damage and injury to the Company and that it would be difficult or impossible to establish the full monetary value of such damage. You further acknowledge and agree that the covenants in this Section 8 are reasonable, necessary, and essential for the Company to protect its legitimate business interests in: (i) the Company's trade secrets (as defined under applicable law, including the Georgia Trade Secrets Act of 1990 (the "Act") and the Defend Trade Secrets Act of 2016 (the "DTSA")); (ii) the Company's valuable Confidential Information; (iii) substantial relationships with specific prospective or existing customers of the Company; (iv) customer good will associated with (A) the business of the Company, including, but not limited to, by way of trade name, trademark, service mark, or trade dress, (B) a specific geographic location; or (C) a specific marketing or trade area; and (v) extraordinary or specialized training you have received or will receive. You further acknowledge and agree (i) by reason of the Company's investment of time, training, money, trust, exposure to the public, or exposure to customers, vendors, or other business relationships during the course of your employment with the Company, you have attained or will attain a high level of influence or credibility with the Company's Protected Customers, vendors, or other business relationships; and (ii) by reason of working for the Company, you are or will be in possession of selective or specialized skills, learning, or abilities, or customer contacts or customer information, or Confidential Information. Finally, you acknowledge and agree that the scope of responsibilities of your position extends throughout the geographic area where the Company has conducted and will conduct business during your employment, and that your work for the Company has brought and will bring you into close contact with many of the Company's customers, trade secrets and confidential and proprietary information.

**8.2 Unfair Competition.** You acknowledge and agree that, as a result of your receipt of Confidential Information, your role at the Company, and your relationships with Company customers and/or employees you would have an unfair competitive advantage if you were to violate this Section 8 and that, in the event that your employment with the Company terminates for any reason, you possess marketable skills and abilities that will enable you to find suitable employment without violating the covenants set forth in this Section 8. You further acknowledge and affirm that you are accepting this Agreement voluntarily, that you have read this Agreement carefully, that you have had a full and reasonable opportunity to consider this Agreement (including actual consultation with legal counsel), and that you have not been pressured or in any way coerced, threatened or intimidated into entering into this Agreement.

**8.3 Non-Disclosure and Prohibition Against Use of Confidential Information and Trade Secrets.** You agree that you will not, directly or indirectly, reveal, divulge, or disclose any Confidential Information or Trade Secrets to any person not expressly authorized by the Company to receive such information. You further agree that you will not, directly or indirectly, use or make use of any Confidential Information or Trade Secrets in connection with any business activity other than business activity that you are pursuing on behalf of the Company. You acknowledge and agree that this Section 8 is not intended to, and does not, alter either the Company's rights or your obligations under any state or federal statutory or common law regarding trade secrets and unfair trade practices. The act of emailing Confidential Information or Trade Secrets or both to your personal email address is considered to be a breach of this section. You also understand that nothing contained in this Section 8 limits your ability to communicate with any federal, state or local governmental agency or commission ("Government Agencies") or otherwise participate in any investigation or proceeding that may be conducted by any Government Agencies in

connection with any charge or complaint, whether filed by you, on your behalf, or by any other individual. You additionally understand and agree that as required by the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1833(b), you have been notified that if you make a confidential disclosure of a Company Trade Secret (as defined in 18 U.S.C. § 1839) to a government official or an attorney for the sole purpose of reporting or investigating a suspected violation of law, or in a complaint or other document filed in a legal proceeding, so long as any document you file containing the trade secret is filed under seal and you do not disclose the trade secret except pursuant to court order, you shall not be held civilly or criminally liable under this Agreement or under any federal or state trade secret law for such a disclosure. The DTSA does not authorize, or limit liability for, an act that is otherwise prohibited by law, such as the unlawful access of material by unauthorized means. You promise that, no later than the end of your Company employment, you will return to the Company all files, memoranda, documents, records, credit cards, keys, computers, printers, telephones, and other property of the Company or its affiliates in your possession, custody, or control, including without limitation all Confidential Information. To the extent that you have, or become aware after your Separation Date that you have, electronic files or information in your personal possession or under your control that belong to the Company or contain Confidential Information (specifically including without limitation electronic files or information stored on personal computers, mobile devices, electronic media, or in cloud storage), you promise that you will notify the Company in writing as to such possession or control prior to your Separation Date or immediately after you become aware of such possession, and, if requested to do so by the Company you will cooperate with the Company, and take direction from the Company, regarding the deletion or return of all such files and information, including all copies and derivatives thereof, from all non-Company-owned computers, mobile devices, electronic media, cloud storage, and other media, devices, and equipment, such that such files and information are permanently deleted and irretrievable. For the avoidance of doubt, you are not permitted to delete any Company files or information from any computers, mobile devices, electronic media, or in cloud storage (including those owned personally by you) unless directed to do so in writing by the Company. To the extent requested by the Company, whether prior to or after the Separation Date, you will voluntarily participate in a process involving a forensic computer specialist chosen by the Company to identify, quarantine, preserve and delete all electronic files or information, including all copies and derivatives thereof, in your possession or under your control that belong to the Company or contain Confidential Information.

**8.4** **Non-Solicitation of Protected Employees.** During the Non-Solicit Restricted Period, you will not, without the prior written consent of the Company, directly or indirectly, solicit or induce or attempt to solicit or induce any Protected Employee to terminate or cease his/her employment relationship with the Company or to enter into employment with you or any other person or entity. This employee non-solicitation provision is limited to the geographic area where the Company did business during your employment.

**8.5** **Non-Solicitation of Protected Customers.** During the Non-Solicit Restricted Period, you will not, without the prior written consent of the Company, directly or indirectly, solicit, divert, take away or attempt to solicit, divert or take away a Protected Customer for purposes of providing products and services that are competitive with those provided by the Company.

**8.6** **Covenant Not to Compete.** During the Non-Compete Restricted Period, you will not, without the prior written consent of the Company, (a) work for a Restricted Competitor; (b) provide consulting services to a Restricted Competitor; or (c) otherwise provide services to a Restricted Competitor, in each of (a) through (c) that involves the provision of services that are similar to or relate to those services that you provided to the Company at any time during your employment and that relate, in any way, directly or indirectly, to the Restricted Competitor's competition with the transportation, delivery or logistics services provided by the Company during your employment. This non-compete provision is limited to the geographic area where the Company did business during your employment.

**8.7 Enforcement.** You acknowledge and agree that the covenants in Sections 8.3 through 8.6 ("Protective Covenants") are necessary to protect the Company's legitimate business interests. In the event that you breach, or threaten to breach, the Protective Covenants, you agree that the Company shall have the right and remedy to: (a) enjoin you, preliminarily and permanently (without the necessity of posting bond), from violating or threatening to violate the Protective Covenants because any breach or threatened breach of the Protective Covenants would cause irreparable injury to the Company and that money damages would not provide an adequate remedy; (b) require you to account for and pay over to the Company all compensation, profits, monies, or other benefits derived or received by you as the result of any breach of the Protective Covenants; and (c) require you to pay the reasonable attorneys' fees and costs incurred by the Company in enforcing the Protective Covenants. In addition, in the event of such a violation, you will automatically forfeit all Units.

**8.8 Severability/Reformation.** You acknowledge and agree that the Protective Covenants are reasonable in time, scope, geography and all other respects and that they will be considered and construed as separate and independent covenants. Should any part or provision of any of the Protective Covenants be held invalid, void or unenforceable in any court of competent jurisdiction, you understand and agree that such invalidity, voidness or unenforceability does not invalidate, void or otherwise render unenforceable any other part or provision of this Agreement. You further agree that, in the event any court of competent jurisdiction finds any of the Protective Covenants to be invalid or unenforceable (in whole or in part), such court shall modify the invalid or unenforceable term so that the Protective Covenants are enforceable to the fullest extent permitted by law.

**8.9 Applicable Law and Exclusive Jurisdiction.**

**8.9.1** Section 8 of these LTIP terms and conditions are governed by the laws of the State of Georgia. Any and all claims arising out of or relating to this Section 8 will be brought in the state and federal courts located in Fulton County, Georgia, which will be the sole and exclusive jurisdiction and venue for all disputes between the parties under this Section 8. You hereby irrevocably consent to the jurisdiction and venue of the state and federal courts located in Fulton County, Georgia for adjudication of all disputes between the parties with respect to this Section 8. You hereby waive any objections or defenses to jurisdiction or venue in any such proceeding before such court.

**8.9.2** Notwithstanding the foregoing, if you primarily resided and worked for the Company in California immediately prior to the end of your employment, or following the termination of your employment, you reside and work in California, you agree that (a) California law shall apply to this Section 8, and (b) the federal or state courts of California will be the sole and exclusive jurisdiction and venue over any dispute relating to this Section 8 and you specifically and irrevocably consent to personal jurisdiction in such courts even if you do not reside in California at the time of any dispute arising out of or involving this Section 8.

**8.9.3** Notwithstanding the foregoing, if you primarily resided and worked for the Company in Minnesota immediately prior to the end of your company employment, you agree and acknowledge that your consent to jurisdiction and venue in Georgia is voluntary and that you are not being required to accept Georgia jurisdiction and venue as a condition of your employment.

**8.10 Tolling During Violation.** In the event the enforceability of any of the terms of this Section 8 is challenged in a court of competent jurisdiction and you are not enjoined from breaching any of the restrictive covenants, then if a court of competent jurisdiction finds that the challenged restrictive covenant(s) is enforceable, the time periods set forth herein shall be deemed tolled upon the filing of the claim challenging the enforceability of this Section 8 until the dispute is finally resolved and all periods of appeal have expired.

**8.11** **Disclosure.** In the event that you leave the Company for any reason, you agree to disclose the existence and terms of this Section 8 to any prospective employer, partner, co-venturer, investor or lender prior to entering into an employment, partnership or other business relationship with such prospective employer, partner, co-venturer, investor or lender.

**8.12** **Definitions**. For purposes of this Section 8:

**8.12.1** "Company" means, for purposes of this Section 8 only, United Parcel Service, Inc., a Delaware Corporation with its principal place of business in Atlanta, Georgia, and all of its Affiliates (as defined in O.C.G.A. § 13-8-51(1)).

**8.12.2** "Confidential Information" means all information regarding the Company, its activities, businesses or customers which you learned as a result of your employment, that is valuable to the Company and that is not generally disclosed by practice or authority to persons not employed or otherwise engaged by the Company, whether or not it constitutes a Trade Secret. "Confidential Information" shall include, but is not limited to, financial plans and data; legal affairs; management planning information; business plans; acquisition plans; operational methods and technology; market studies; marketing plans or strategies; product development techniques or plans; customer lists; details of customer contracts; current and anticipated customer requirements and specifications; customer pricing and profitability data; past, current and planned research and development; employee-related information and new personnel acquisition plans. "Confidential Information" shall not include information that is or becomes generally available to the public by the act of one who has the right to disclose such information without violating any right or privilege of the Company. However, although certain information may be generally known in the relevant industry, the fact that the Company uses such information may not be so known and in such instance the information would compromise Confidential Information. This definition shall not limit any definition of "confidential information" or any equivalent term under applicable state or federal law.

**8.12.3** "Material Contact" means the contact between you and each customer or actively sought potential customer of the Company: (A) with whom or with which you dealt on behalf of the Company in support of the initiation, maintenance or furtherance of a business relationship between Company and each customer or actively sought potential customer; (B) whose dealings with the Company were coordinated or supervised by you; (C) about whom you obtained Confidential Information in the ordinary course of business as a result of your association with the Company; or (D) who receives products or services authorized by the Company, the sale or provision of which results or resulted in compensation, commissions, or earnings for you in the two (2) years prior to your termination of employment

**8.12.4** "Non-Compete Restricted Period" means during your employment with the Company and for a period of one (1) year after your employment ends for any reason.

**8.12.5** "Non-Solicit Restricted Period" means during your employment with the Company and for a period of two (2) years after your employment ends for any reason

**8.12.6** "Protected Customers" means customers or actively sought potential customers with whom you had Material Contact in the two (2) years prior to your termination of employment.

**8.12.7** "Protected Employee" means an employee of the Company who is employed by the Company in a position of Band 20 or higher at the time of any solicitation or attempted solicitation by you and with whom (a) you had contact during the two (2) years prior to your termination of employment, or (b) about whom you learned Confidential Information during the two (2) years prior to your termination of employment.

**8.12.8** "Restricted Competitors" means a person engaged in any business competitive with the Company's and its Subsidiaries' businesses of package delivery and global supply chain management solutions. Restricted Competitors shall be defined to include any affiliates of such entities that are engaged in delivery, transportation, and/or logistics services and activities. In addition, Restricted Competitors include, without limitation, the entities listed on Exhibit B.

**8.12.9** "Trade Secret" means all of the Company's information that you learned about as a result of your employment, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, distribution lists or a list of actual or potential customers, advertisers or suppliers, that (i) derives economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. This definition shall not limit any definition of "trade secrets" or any equivalent term under applicable law.

**8.13 Amendments for Certain Employees.**

**8.13.1 Amendments for California Employees.** Sections 8.4 through 8.6 do not apply to you if you primarily resided or worked for the Company in California immediately prior to the end of your employment, or if following the termination of your employment, you reside and work in California. Notwithstanding the foregoing, you are and shall continue to be prohibited from any unauthorized use, transfer, or disclosure of the Company's Confidential Information, including trade secrets, pursuant to the California Trade Secrets Act, the U.S. Defend Trade Secrets Act of 2016, any other confidentiality and non-disclosure agreements with the Company, and any other applicable federal, state and common law protections afforded proprietary business and trade secret information. You also agree that you will not, without the prior written consent of the Company, directly or indirectly, interfere with the Company's business by soliciting or inducing or attempt to solicit or induce any Protected Employee to terminate or cease his/her employment relationship with the Company for a period of twelve (12) months from and after your employment ends.

**8.13.2 Amendments for Hawaii, North Dakota, Minnesota and Oklahoma Employees.** Section 8.6 does not apply to you if you primarily resided and worked for the Company in Hawaii, North Dakota, Minnesota or Oklahoma immediately prior to the end of your Company employment, and following the termination of your Company employment, you continue to reside and work in Hawaii, North Dakota, Minnesota or Oklahoma.

**8.13.3 Amendment for Massachusetts Employees**. Section 8.6 does not apply to you if: (1) you primarily resided and worked for the Company in Massachusetts immediately prior to the end of your Company employment, and following the termination of your Company employment, you continue to reside and work in Massachusetts; and (2) Section 8.6 is unenforceable pursuant to Massachusetts General Laws c. 149 § 24L.

**8.14 Other Restrictions.** For the avoidance of doubt, if you are based in the U.S. this Section 8 does not supersede any protective covenants applicable to you with respect to the Company, and those covenants shall continue in full force and effect in accordance with their terms. If you are based outside the US any protective covenants set out in your contract of employment, or otherwise applicable to your employment with the Company, whether concluded prior to or after the date of this Agreement, supersede the equivalent provisions set out in this Section 8.

**9. Transferability.** You may not sell, gift, or otherwise transfer or dispose of any Units.

10. **Vesting Terms.** If you remain an active employee through the last business day of the Performance Period, then the number of Units that vest following the end of the Performance Period, if any, will be based on the achievement of the performance goals related to each of the performance metrics set forth herein. Shares attributable to the number of vested Units and dividend equivalent units (described below), if any, will be transferred to you during the calendar quarter following the end of the Performance Period. Except as set forth below, if employment with the Company is terminated after the Date of Grant but prior to the last business day of the Performance Period, then your unvested Units will be forfeited.

**10.1** **Death.** If you are an active employee for six continuous months from the beginning of the Performance Period and your employment terminates prior to the last business day of the Performance Period as a result of death, then Shares attributable to a prorated number of Units (calculated at target based on the number of months worked during the Performance Period) will be transferred to your estate no later than 90 days after the date of your death.

**10.2** **Disability or Retirement.** If you are an active employee for six continuous months from the beginning of the Performance Period and your employment terminates prior to the last business day of the Performance Period as a result of disability or Retirement (as defined below), then Shares attributable to a prorated number of vested Units (based on actual results for the full Performance Period and the number of months worked during the Performance Period) will be transferred to you during the calendar quarter following the end of the Performance Period. For purposes of the LTIP, Retirement is defined as (a) the attainment of age 55 with a minimum of 10 years of continuous employment accompanied by the cessation of employment with the Company and all Subsidiaries, (b) the attainment of age 60 with a minimum of 5 years of continuous employment accompanied by the cessation of employment with the Company and all Subsidiaries, or (c) "retirement" as determined by the Committee in its sole discretion.

**10.3** **Demotion.** If you are an active employee for six continuous months from the beginning of the Performance Period and, prior to the last business day of the Performance Period, you are demoted to a position that would have been ineligible to receive an LTIP award, then Shares attributable to a prorated number of vested Units (based on actual results for the full Performance Period and the number of months worked during the Performance Period prior to the demotion) will be transferred to you during the calendar quarter following the end of the Performance Period.

11. **Repayment.** Notwithstanding anything in this document to the contrary, you acknowledge and agree that this document and the awards described herein (and any settlement thereof) are subject to the terms and conditions of the Company's Incentive-Based Compensation Clawback Policy (or such other policy relating to the recovery of incentive compensation as may be in effect from time to time), and that relevant sections of this document shall be deemed superseded by and subject to the terms and conditions of such policy.

12. **Withholding.** Awards shall be reduced for applicable taxes or you will be required to remit taxes to the Company in accordance with the terms of the ICP.

13. **Dividend Equivalents.** Dividends payable on the number of shares represented by your Units (including whole and fractional Units) will be allocated to your account in the form of dividend equivalent units ("DEUs") (whole and fractional). DEUs will be allocated to your account each time dividends are paid by (i) multiplying the cash (or stock) dividend paid per share of the Company's class B common stock by the number of outstanding target number Units (and previously credited DEUs) prior to adjustment for the dividend, and (ii) dividing the product by the Fair Market Value of a Share on the day the dividend is declared, provided that the record date occurs after the Grant Date. DEUs will be subject to the same vesting conditions as the underlying Award.

14. **Miscellaneous.**

**14.1** **Awards Subject to the Terms of the ICP.** LTIP Awards are subject to the terms of the ICP**.**

**14.2** **Section 409A.** Each Award is intended either to be exempt from Code § 409A and the 409A Guidance or to comply with Code § 409A and the 409A Guidance. The Award Document and the ICP shall be administered in a manner consistent with this intent, and any provision that would cause the Award Document or the ICP to fail to satisfy Code § 409A or the 409A Guidance shall have no force or effect until amended to comply with or be exempt from Code § 409A and the 409A Guidance (which amendment may be retroactive to the extent permitted by Code § 409A and the 409A Guidance and may be made by the Company without your consent). To the extent that benefits provided under an Award constitute deferred compensation for purposes of Code § 409A and the 409A Guidance and to the extent that deferred compensation is payable upon a "separation from service" as defined in Code § 409A and the 409A Guidance, no amount of deferred compensation shall be paid or transferred to you as a result of your separation from service until the date which is the earlier of (i) the first day of the seventh month after your separation from service or (ii) the date of your death (the "Delay Period").

**14.3** **Severability.** The provisions of the LTIP are severable and if any one or more provisions are determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable.

**14.4** **Waiver.** You acknowledge that a waiver by the Company of breach of any provision of the LTIP shall not operate or be construed as a waiver of any other provision of the LTIP, or of any subsequent breach by you or any other participant.

**14.5** **Imposition of Other Requirements.** The Committee reserves the right to impose other requirements on your participation in the LTIP, on the Units and on any shares of Stock acquired under the ICP, to the extent the Committee determines it is necessary or advisable for legal or administrative reasons, and to require you to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

**14.6** **Amendment and Termination.** The Committee may amend, alter, suspend or terminate the LTIP and any Award at any time subject to the terms of the ICP. Any such amendment shall be in writing and approved by the Committee. A committee comprised of members of management of the Company for purposes of administering compensation ("Management Compensation Committee"), may make administrative amendments to the LTIP from time to time; provided, however, that any such amendment shall be reviewed with the Committee and kept with the records of the LTIP.

**14.7** **Electronic Delivery.** The Company may, in its sole discretion, deliver any documents related to the Units and your participation in the ICP, or future awards that may be granted under the ICP, by electronic means or request your consent to participate in the ICP by electronic means. You hereby consent to receive such documents by electronic delivery and, if requested, agree to participate in the ICP through an on-line or electronic system established and maintained by the Company or another third party designated by the Company.

**14.8** **No Right to Future Awards or Employment.** The grant of the Units under an Award to you is a voluntary, discretionary award being made on a one-time basis and it does not constitute a commitment to make any future awards. Nothing contained in the Award Document shall confer upon you any right to be employed or remain employed by the Company or any of its Subsidiaries, nor limit or affect in any manner the right of the Company or any of its Subsidiaries to terminate your employment or adjust your compensation.

**14.9** **Acknowledgement.** You acknowledge that you (a) have received a copy of the ICP, (b) have had an opportunity to review the terms of the Award Document and the ICP, (c) understand the terms and conditions of the Award Document and the ICP and (d) agree to such terms and conditions.

**Exhibit A**

Long-Term Incentive Performance Program

| CLASSIFICATION | TARGET LTIP AWARD PERCENTAGE |
|---|---|
| Chief Executive Officer | 1,185% |
| Executive Leadership Team Member (other than the CEO) | 350% - 550% |
| Region Managers | 200% |
| District Managers | 100% |
| Region Staff Managers | 50% |

**Exhibit B**

LIST OF RESTRICTED COMPETITORS
(Includes all subsidiaries and associated businesses)

[redacted]

[redacted]

You agree to review this list with the Company as requested during your employment and agree to make any revisions that may be necessary based on changes to the Company's business operations and/or the delivery, transportation and/or logistics industry.

United Parcel Service, Inc.
Restricted Performance Unit Award Agreement
2024 Long-Term Incentive Performance (LTIP) Program Awards
(Not Transferable)

THIS CERTIFIES THAT **MERCADO, GIANINNA** has been granted a target award of **657** Restricted Performance Units ("Units"). Each Unit has a value that equals the value of one share of the class A common stock of UNITED PARCEL SERVICE, INC., a Delaware corporation (the "Company").

IN WITNESS WHEREOF, UNITED PARCEL SERVICE, INC. has caused this Restricted Performance Unit Award to be issued as of March 20, 2024.

ATTEST: UNITED PARCEL SERVICE, INC.

Chief Executive Officer Chief Legal and Compliance Officer

Summary Terms and Conditions: This target award is granted pursuant to the United Parcel Service, Inc. 2021 Omnibus Incentive Compensation Plan (the "Plan") and the Long-Term Incentive Performance Program Terms and Conditions (the "LTIP"). The award is subject to the conditions and limitations of the Plan and the LTIP, including the employee covenants described below. All the terms and provisions of the Plan and the LTIP are incorporated herein by reference. Terms not defined in this certificate are defined in the Plan or the LTIP. The Plan or the LTIP will control in the event of any inconsistency between this certificate and the Plan or the LTIP. The Plan prospectus and the LTIP are available on UPSers.com. By accepting this Award, you unconditionally agree to be bound by the applicable terms, conditions and provisions of the Plan, the LTIP and this certificate.

Performance Period: January 1, 2024 – December 31, 2026

Performance Metrics: [redacted]

Performance Targets: [redacted]

** Interim points are interpolated on a straight-line basis*

Payout Modifier: [redacted]

[redacted]

Calculation of Units Earned: [redacted]

[redacted]

| | | | | |
|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

Vesting: Shares underlying vested Units shall be transferred to you (or your estate in the event of death) as follows:

(a) If you are employed on the last business day of the Performance Period, then Shares will be transferred during the calendar quarter following the completion of the Performance Period.

(b) If you are an active employee for at least six full continuous months from the beginning of the Performance Period and your employment terminates prior to the last business day of the Performance Period as a result of death, then Shares underlying a prorated number of Units (calculated at target based on the number of months worked during the Performance Period) will be transferred to your estate no later than 90 days after the date of your death.

(c) If you are an active employee for at least six full continuous months from the beginning of the Performance Period and your employment terminates prior to the last business day of the Performance Period as a result of disability or retirement, then Shares underlying a prorated number of Units (based on actual performance results and the number of months worked during the Performance Period) will be transferred to you during the calendar quarter following the completion of the Performance Period.

(d) If you are an active employee for at least six full continuous months from the beginning of the Performance Period and you are demoted prior to the last business day of the Performance Period to a position that would have been ineligible to receive an LTIP award, then Shares underlying a prorated number of Units (based on actual performance results and the number of months worked during the Performance Period prior to the demotion) will be transferred to you during the calendar quarter following the completion of the Performance Period.

Forfeiture: You will forfeit any right to these Units if your employment terminates before the end of the Performance Period other than by reason of your death, disability or retirement. The forfeited Units will not be restored even if you return to employment with the Company or an affiliate before the end of the Performance Period.

Transferability: This Award and these Units are not transferable except by will or the laws of descent and distribution.

Change in Control: For purposes of Article 14 of the Plan (Change in Control), Units will be treated the same as Restricted Stock Units.

Employee Covenants: By accepting this Award, you unconditionally agree to be bound by the applicable employee covenants included in the terms and conditions of the LTIP. If your employment with the Company terminates, these covenants generally prohibit the unauthorized disclosure of confidential information, restrict the solicitation of the Company's employees or customers for two years, and restrict your ability to work for a competitor of the Company for one year. You hereby acknowledge that you have read the LTIP terms and conditions carefully and that you fully understand and agree to your obligations under these covenants.

Accepted on: March 28, 2024